IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

RONNIE LEE THUMS,

      Petitioner,

v.

LARRY FUCHS[1], Warden,
Columbia Correctional Institution,

      Respondent.

OPINION AND ORDER

16-cv-861-wmc

Petitioner Ronnie Lee Thums, currently incarcerated at the Columbia Correctional Institution, petitions this court for a writ of habeas corpus under 28 U.S.C. § 2254, challenging a judgment of conviction entered against him in the Circuit Court for Jackson County, Wisconsin, for solicitation of first-degree intentional homicide, conspiracy to commit first-degree intentional homicide, and two counts of solicitation of burglary of a dwelling.[2]  This court previously screened the petition and a later amendment, ordering the State to respond to the following claims:  (1) Thums' jury was biased; (2) the trial court held improper, *ex parte* conferences with the jury; (3) prosecutorial misconduct; (4) newly-discovered evidence; (5) ineffective assistance of post-conviction counsel; (6) ineffective assistance of appellate counsel; (7) ineffective assistance of trial counsel based on numerous alleged errors; and (8) the trial court was biased.

---

[1] Pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases, Larry Fuchs, the current warden at the institution where petitioner is in custody, is substituted for former warden Michael Dittman.

[2] Thums is currently serving a 29-year prison sentence, to be followed by a 12-year period of extended supervision.

As discussed in more detail below, federal review of most of these claims is barred under the procedural default doctrine, since Thums failed to pursue the claims all the way to the Wisconsin Supreme Court. As for his non-defaulted claims, Thums has not met his heavy burden of proof on collateral, federal review of his state convictions, which requires him to show that the Wisconsin Court of Appeals unreasonably applied clearly established federal law or unreasonably determined the facts when it rejected the claims and affirmed his conviction. Finally, although Thums may still have state court remedies available to him on his claim of ineffective assistance of appellate counsel, that claim also appears to lack merit. For these reasons, the court will deny his habeas petition.

FACTS[3]

## A. Background

Already an inmate at the Jackson Correctional Institution ("JCI"), Thums was charged with solicitation of and conspiracy to commit first-degree intentional homicide, along with two counts of solicitation of burglary of a dwelling, following an investigation prompted by his JCI cellmate, Robert Trepanier, who wrote to the Winnebago District Attorney in March 2009. In that letter, Trepanier reported that Thums had offered him $10,000 to kill Thums' ex-wife and their two children, as well as the man with whom she

---

[3]These facts are drawn largely from the Wisconsin Court of Appeals' unpublished decision on Thums' direct appeal, *State v. Thums*, No. 2012AP929-CR, 2013 WI App 105, 349 Wis. 2d 788, 837 N.W.2d 177 (Table) (Wis. Ct. App. July 25, 2013), a copy of which is in the record at Dkt. #18-5.

was currently in a relationship.  Trepanier further stated that Thums had provided his ex-wife's name, address and a map, the former two of which Trepanier disclosed in his letter.

After conducting a background investigation, the police arranged for Trepanier to wear a recording device and to meet with Thums in the prison library.  During their conversation, Thums and Trepanier discussed who he wanted killed and how he would like it done.   A portion of the transcript of their recorded conversation reads as follows:

> [Trepanier]: ... How do you want me to do this? Do you want me to blow the house up? Did you want me to do the whole family?
>
> [Thums]: It's your choice man. I got no feeling for these fuckers at all fuck me? My own daughter is just fucking shittin on me and that little bitch won't even write me—
>
> [Trepanier]: How come?
>
> [Thums]: Cause they bought her that new fucking car. That little bitch dude. The whole fucking works needs to suffer as far as I'm concerned. Take what you can get out of it the fucking mess and just scoop her fucking eyeballs out blow the bitch up I don't give a fuck.
>
> [Trepanier]: You want the whole family done and the whole works?
>
> [Thums]: Yes
>
> [Trepanier]: You're sure about this?
>
> [Thums]: I'm sure....
>
> *2 ....
>
> [Trepanier]: How do you want this, do you want this baby blown up? Or do you want to collect the insurance? Do you want to keep what? What? I don't know.
>
> [Thums]: Kill the bitch, blow her up I don't care. She's history.

3

[Trepanier]: The other daughter too?

[Thums]: If you have to that's good enough. Whoever's in that fuckin house gotta go as far as I'm concerned.

During the recorded conversation, Thums and Trepanier also discussed payment for the services he was going to provide. Specifically, Thums suggested that Trepanier could burglarize the home of his former mother-in-law, which contained valuable duck decoys:

[Trepanier]: Send me some money. I'm gonna have this taken care of. I went this far, I told you I was gonna get the pictures taken, there ya go. Send uh, have your Mom send—

[Thums]: She's dead.

....

[Thums]: ... You can get some money out of those ducks.

[Trepanier]: But I need some money. I need a little money.

[Thums]: I don't have any way to send you some money. I'm not getting anything anymore.

....

[Trepanier]: So how we gonna do this now?

[Thums]: Well I said, this bitch at her mother's place, you could grab those ducks and you could get twenty, at least ten—

[Trepanier]: Does he still have those golf clubs that you were telling me?

[Thums]: Oh, yeah yeah, that gold plated fuckin driver. There's also—

[Trepanier]: But I need some fuckin money because I gotta hit and run.

[Thums]: All you have to do is fuckin burglarize that motherfucking house then (inaudible) you'll be paid for awhile.

4

> Trust me that fuckin bitch has got cash laying around the house.

During this conversation, Thums also drew another map for Trepanier, which depicted the location of the homes of Thums' ex-wife and her mother.

## B. Trial

At trial in Jackson County Circuit Court, Trepanier testified that Thums had offered him money to kill Thums' ex-wife and anyone else who was in the house. The state also played the audiotape of Trepanier's conversation with Thums for the jury.

Thums' defense was that he never intended to have anyone killed. Instead, Thums chose to take the stand and testify at trial that *Trepanier* had attempted to talk him into paying to have his ex-wife killed because Trepanier wanted money. Thums further testified that: Trepanier had assaulted him in late March 2009; as a result, he was afraid of Trepanier; and he only went along with the plan to kill his ex-wife so that Trepanier would not hurt *him*.

With respect to the handmade maps, Thums testified that he provided the first map so that Trepanier's girlfriend could take photos of Thums' ex-wife's house, as well as to reminisce with Trepanier (who hailed from the same town) about certain schools, churches and fishing spots near the home. Although not asked specifically about the second map, Thums also admitted that he met with Trepanier in the library (as he had to do), but claimed he made the statements heard on the recording in order to string Trepanier along, so as to avoid further assaults and demands for money.

Circuit Court Judge Thomas Lister instructed the jury that the crime of conspiracy as defined by Wis. Stat. § 939.31

is committed by one who, with intent that a crime be committed, agrees or combines with another for the purpose of committing that crime, if one or more of the parties to the conspiracy does an act to effect its object.

The defendant in this case is charged with having conspired to commit the crime of first degree intentional homicide.

Before you may find the defendant guilty of this offense, the State must prove by evidence which satisfies you beyond a reasonable doubt that the following three elements were present.

First, the defendant intended that the crime of first degree intentional homicide by committed.  The crime of first degree intentional homicide is committed by one who causes the death of another and acts with the intent to kill.  Intent to kill means that one has the mental purpose to take the life of another human being.

Secondly, the defendant was a member of a conspiracy to commit the crime of first degree intentional homicide.

A person is a member of a conspiracy if, with intent that that a crime be committed, the person agrees with or joins with another for the purpose of committing that crime.  A conspiracy is a mutual understanding to accomplish some common criminal objective or to work together for a common criminal purpose.  It is not necessary that the conspirators had any express or formal agreement, or that they had a meeting, or even that they all knew each other.

As long as the parties agreed or combined by their words or actions and the defendant intended that the agreement be carried out, it is not necessary that the other person intended to carry out the agreement.

One or more of the conspirators performed an act toward the commission of the intended crime that went beyond mere planning and agreement is the third element.

However, the act need not, by itself, be an unlawful act or an attempt to commit the crime.  If there was an act which was a step toward accomplishing the criminal objective, that is sufficient.

You cannot look into a person's mind to find intent.  Intent must be found, if found at all, from the defendant's acts, words, and statements, if any, and from all the facts and circumstances in this case which bear upon intent.

If you are satisfied beyond a reasonable doubt that all three elements of the offense have been proven, you should find the defendant guilty.

If you are not so satisfied, you must find the defendant not guilty.

During closings, the government's counsel argued that Thums' creation of the second map during the recorded conversation between Thums and Trepanier, depicting the location of the residences of Thums' ex-wife and her mother, constituted the overt act Thums performed in furtherance of the conspiracy.  While deliberating, the jury then sent a question to the judge asking about the "overt act" element.  Specifically, the jury asked:

How do we decipher between "Act" and "Planning"?  One or more of the conspirators performed an act toward the commission of the intended crime that went beyond mere planning and agreement.  In this case is the planning the act?

During a subsequent bench conference to discuss a possible response to the jury's question,[4] defense counsel suggested, and the prosecutor agreed, that the jury be advised as follows:  "The State is alleging that the drawing of the map is the act that went beyond the mere planning.  That is a question of fact for you, the jury, to decide."  Thums and the jury were then brought into the courtroom, and the trial judge instructed the jury as follows:

Ladies and gentlemen, I have the most recent question that has been posed by the jury concerning the difference between the use of the term "act" and "planning" and agreement as set forth in the instruction, and I will do my best to shed some light on that for you.

---

[4] Counsel expressly waived Thums' appearance at that conference.

7

There must be an act that goes beyond mere planning an agreement. The State in this case alleges that the act of drafting and delivering the maps that you have seen was the necessary act which was a step toward accomplishing the criminal objective.

If you conclude that it is a fact that there was an act which was a step beyond mere planning an agreement, then that is sufficient for purposes of the instruction and the crime of conspiracy.

When asked by the judge, defense counsel stated that he was satisfied with the court's instruction.[5]

About an hour later, the jury sent out the following note, unrelated to the "overt act" question:

We as the jury are NOT satisfied with what was explained to us this morning, that our names are not in Mr. Thums' possession.  We all saw him closely examining the list and seating chart and taking notes.  We are requesting that his stack of paperwork and notes be gone through in front of us, in order to prove to us that he does not have copies, notes or anything else with any of our names on anything.

(Dkt. #1-3.)  In response, the judge once again convened the attorneys in the courtroom to address this unusual note.  (Tr. of 3rd Day of Jury Trial (dkt. #18-20) 41.)[6]  After some discussion, the judge and counsel agreed that the jail captain would review all of Thums' materials at the end of the trial to ensure that he did

---

[5] On Thums' direct appeal, he argued that the "planning *an* agreement" language misled the jury about what they needed to find in order to convict Thums of conspiracy to commit first degree intentional homicide.  In response, the State argued that the "an" was likely a transcription error and that it was more reasonable to believe that the court had correctly stated "planning *and* agreement," but that in any case the error was non-prejudicial given that the jury plainly did not believe Thums' innocent explanation for drawing the maps.

[6] Thums was not present during this bench conference as well, although this time his absence was not expressly waived by defense counsel on the record, either because it was assumed based on his previous waiver or because the subject matter of the note itself was one involving the jury's security concerns, rather than their deliberation on the merits.

not have any personal information about any of the jurors, and the court would inform the jury of this fact.  (*Id*. 43.)  Judge Lister indicated that he would "tell them again about the fact that all other materials have been sealed and I will  be referring to them by number at any time that any polling is required."  (*Id*. 43-44.)  The prosecutor then stated:

> Now, this is the second time that this issue has been raised.  I am starting to be concerned that our jury may be reluctant to return a just verdict based on fear of reprisal.  Obviously, that's a risk that the State takes in any case -- but it's starting to concern me.

(*Id*. 44.)[7]

When the judge indicated that the jury should be brought in, defense counsel interjected, noting that Thums was not present in the courtroom.  Judge Lister expressed concern that Thums' presence would "heighten [the jury's] anxiety," but defense counsel noted that Thums had been present every other time the court had addressed the jury.  (*Id*. 44-45.)  Apparently as a comprise, the court then asked counsel if either would "object to my meeting with the jury and explaining this to them in the jury room?," to which both counsel voiced no objection.  Before the judge entered the jury room, the clerk noted that one of the juror's wives wanted him to call her at work, to which the court replied, "As soon as they complete their work, he is welcome to do that."  (*Id*. at 46.)

---

[7]Although the jury, the prosecutor, and the court all allude to an earlier question by jurors about the privacy of their information, no such question appears on the record and likely was raised in a discussion between court staff and jury members earlier that morning.  Regardless, Thums' counsel presumably was advised of that discussion, since he raised no concern about any earlier inquiry, and Judge Lister would later disavow *any* previous discussion between the jury and himself.  Nevertheless, these allusions to an earlier question is the basis for Thums' claim that he was denied his constitutional right to be present during communications between the judge and the jury that is addressed in the opinion below.

Judge Lister left the courtroom and returned three minutes later, summarizing for the record his conversation with the jurors about steps the court would take to keep their information private.  He also advised the attorneys that the jury had reached a verdict.  (*Id.* 48.)

After further deliberations, the jury ultimately found Thums guilty of all counts.

### C. Original Postconviction Motion and Direct Appeal

Attorney Steven House was appointed to represent Thums in postconviction proceedings before the Circuit Court under Wis. Stat. § 974.02 and on direct appeal.  On December 28, 2011, Attorney House filed a motion for postconviction relief, alleging judicial errors and ineffective assistance of trial counsel.  After an evidentiary hearing on February 10, 2012, the court took the matter under advisement.

On February 28, 2012, while his § 974.02 motion was pending, Thums also filed his own letter asking the circuit court to vacate the judgment of conviction on the ground that Judge Lister erred when he met *ex parte* with the deliberating jury.  The court construed the *pro se* filing as a separate motion for new trial in the interests of justice, which it rejected.  Specifically, the circuit court found that the judge's *ex parte* contact did not require a new trial because the jury had reached its verdict before the communication occurred.

On April 10, 2012, the court entered a decision formally denying Thums' *pro se* claim, as well as the other claims for relief proffered by his counsel, finding that none of those claims entitled him to a new trial.  Indeed, in denying the postconviction motion,

Judge Lister explained that even if his trial counsel had *not* erred as Thums now asserted, he did

> not believe that there is even a remote possibility that the result of the trial would have been different. The evidence established that Thums was a volatile, revengeful, dangerous, unbalanced, and non-credible person. There was overwhelming evidence of his guilt[ ]. His former wife and even the jurors were terrified by him. The reliability of the results of this trial were unaffected errors claimed by the appellate counsel and the Court has great confidence in the outcome reached by the jury.

*State v. Thums*, 2013 WI App 105, ¶ 38.

Attorney House then appealed both Thums' conviction and this order denying postconviction relief. While omitting any further challenge based on the trial court's so-called *ex parte* communication, defendant raised the following challenges on appeal:

> (1) the evidence at trial was insufficient to establish an overt act in furtherance of a conspiracy to commit first degree intentional homicide;

> (2) the circuit court improperly instructed the jury as to the "overt act" element for the crime of conspiracy to commit first-degree intentional homicide;

> (3) the offenses of solicitation and conspiracy to commit first degree homicide were multiplicitous and should have been merged upon conviction;

> (4) trial counsel was ineffective for (a) failing to request the presence of or consult with Thums before offering his responses to two questions asked by the jury during deliberations; (b) failing to submit documentary evidence supporting Thums' testimony that he had reported being attacked by Trepanier to prison officials; (c) permitting the jury to review an unredacted letter from Trepanier to the district attorney that referenced a 1965 cold case involving the shooting of a 14-year-old; and (d) suggesting the additional instruction given to the jury with respect to the "overt act" element, which House argued "effectively endorsed the State's theory of the case";

> (5) the circuit court erred in admitting other acts evidence; and

> (6) the trial court improperly assessed excessive fines without determining Thums' ability to pay.

The Wisconsin Court of Appeals rejected all but the last of Thums' challenges and remanded the case with directions to determine whether Thums had the ability to pay a fine.  (*Id*., ¶¶ 1, 49.)  With respect to Thums' claim that there was insufficient evidence for the jury to find the "overt act" element of the conspiracy charge, the Wisconsin Court of Appeals held that "Thums' act of drawing the map depicting where his ex-wife lived was an act 'beyond mere planning and agreement,' and was instead a 'step toward accomplishing the criminal objective' of having Thums' ex-wife killed. See Wis JI—Criminal 570."  (*Id*. ¶ 13.)

The Wisconsin Court of Appeals also rejected Thums' claims of ineffective assistance of counsel, agreeing with the trial judge that his claim failed under the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).  Specifically, the court found that Thums had *not* been prejudiced by his lawyer's failure to consult with him before responding to jury questions or for having suggested the additional instruction given to the jury in response to their question about the "overt act" element.  (*Id*. ¶ 38.)  As the court explained, "the drafting and the delivery of the map, if other requirements were met, is a sufficient overt act and, therefore, the additional instruction was accurate."  (*Id*. ¶ 20.)

The Court of Appeals also agreed that -- even assuming Thums' trial counsel had performed deficiently in some respects -- there was no reasonable likelihood of a different outcome at trial.  The court noted that the jury had heard the recording of Thums asking Trepanier to kill his ex-wife and daughters, as well as burglarize the residence of his former mother-in-law, all of which belied Thums' claim that he was responding to a perceived

threat from Trepanier.  Finally, the court noted that Thums had admitted that he had drawn the maps showing the location of his ex-wife's home and given them to Trepanier. (*Id*. ¶38.)

Again represented by Attorney House, Thums next petitioned the Wisconsin Supreme Court for review.  In doing so, Thums dropped three of his initial challenges, that: the evidence at trial was insufficient to establish the "overt act" element; the trial court erred in admitting other acts evidence; and trial counsel was ineffective for introducing documents supporting Thums' claim that he had been attacked by Trepanier.  He did *reassert*, however, that:

- the circuit court improperly instructed the jury as to the "overt act" requirement;

- his convictions for solicitation and conspiracy to commit first degree intentional homicide were multiplicitous; and

- his trial counsel was ineffective for

  (a) failing to request the presence of or consult with Thums regarding juror questions;

  (b) failing to ensure a neutral response to the jury's question regarding the "overt act" element of the conspiracy offense; and

  (c) failing to object to the circuit court's re-instruction to the jury with regards to the "overt act" element of the conspiracy charge.

On December 16, 2013, however, the Wisconsin Supreme Court summarily denied Thums' petition without explanation.

### D. Proceedings on Remand

On remand to decide the narrow, remaining question as to Thums' ability to pay a monetary fine, he filed a *pro se* motion, asking the presiding judge to recuse himself from taking further action in his case.  (Aff. For Disqualification of Cir. Ct. Judge (dkt. #21-4).)  Among other things, Thums alleged that the trial judge was biased because he met with the jury in private "at least two times" during deliberations.  (*Id*. 9.)  Thums inferred the occurrence of a supposed, second meeting based on:  (1) the jury's note indicating that they were not satisfied with what had been explained to them "that morning" about the privacy of their personal information; and (2) Judge Lister's and the prosecutor's comments suggesting that the topic had been previously raised by the jurors.

Thums represented himself on remand.  At a May 30, 2014, hearing, Judge Lister addressed Thums' allegation that he met in secret with the jury during its deliberations:

> [Y]ou have repeatedly through submissions to the Appellate Courts accused me and this court of meeting secretly with a jury during the course of their deliberations.  Because you made those allegations, I gave your counsel, both of your attorneys, the right to speak to the jurors to establish that that is absolutely untrue.
>
> I met with the jury after being advised that the jury had reached a verdict and wanted to speak with the Court prior to coming into the courtroom to pronounce their verdict.  I never met the jury at any other time, and that meeting was after deliberations.

(Tr. of Hrg., May 30, 2014 (dkt. #21) at 105.)  Based on these disclosures, Judge Lister declined to recuse himself, issued an order on July 17, 2014, finding that Thums had the ability to pay, and reimposed the fine of $45,000.  Thums did not appeal.

### E. First Collateral Postconviction Motion

On September 4, 2014, Thums filed a *pro se* post-conviction motion under Wis. Stat. § 974.06 (Wisconsin's collateral attack statute), which purported to raise some 38 grounds of error. (Dkt. #21-2.) Generally, Thums argued that: the State committed prosecutorial misconduct by introducing knowingly false evidence and making knowingly false statements to the jury; the judge erred by meeting *ex parte* with the jury two times; Thums' trial counsel was ineffective for numerous reasons; and Thums' postconviction counsel was ineffective in failing to raise issues on Thums' behalf. The circuit court denied Thums' motion without a hearing, determining that his claims were too conclusory to warrant relief. (Dkt. #1-6.) In any case, the court found all of the claims were procedurally barred or raised in the wrong forum. (*Id*.)

In a decision issued December 9, 2015, the Wisconsin Court of Appeals agreed that the circuit court had properly denied this first postconviction motion without a hearing. *State v. Thums*, No. 2014AP2767, 2015 WL 13157971 (Wis. Ct. App. Dec. 9, 2015) (summary disposition).[8] The court ruled that all of Thums' claims were either conclusory, had been previously litigated, were raised in the wrong forum, or were procedurally barred under Wisconsin law by his failure to raise them in his initial posttrial proceedings. (*Id*. at *1.) In particular, the court declined to consider Thums' claim that the circuit court erred by meeting *ex parte* with the jury during both morning and afternoon deliberations, holding that Thums had previously litigated the issue by seeking Judge Lister's recusal before the

---

[8] A copy of this opinion is in the record at dkt.# 1-8.

remand hearing, then failing to appeal.  (*Id*. at *2 (citing *State v. Witkowski*, 163 Wis. 2d 985, 990, 473 N.W.2d 512 (Ct. App. 1991).)

With respect to his numerous claims of prosecutorial misconduct, the court also agreed with the trial court that those claims were procedurally barred as a result of Thums' failure to raise them in his original Wis. Stat. § 974.02 postconviction motion or on direct appeal.  (*Id*. (citing *State v. Lo*, 2003 WI 107, ¶15, 264 Wis. 2d 1, 665 N.W. 2d 756 ("[C]laims of error that could have been raised on direct appeal . . . are barred from being raised in a subsequent [Wis. Stat.] § 974.06 motion, absent a showing of a sufficient reason.").  The court further rejected Thums' claim that ineffective assistance by postconviction counsel was a "sufficient reason" for failing to pursue the claims on direct appeal, and in particular, that Thums had *still* failed in his § 974.06 postconviction motion to show that any of the omitted claims were "clearly stronger" than the claims attorney House did raise.  *Id*. at *2 (citing *State v. Romero-Georgana*, 2014 WI 83, ¶ 4, 360 Wis. 2d 522, 530, 849 N.W.2d 668, 672) (defendant who alleges in a § 974.06 motion that his postconviction counsel was ineffective for failing to bring certain viable claims must demonstrate that the claims he wishes to bring are clearly stronger than the claims postconviction counsel actually brought).  Finally, the court ruled that a § 974.06 motion was not the proper procedural vehicle for Thums' claim that his postconviction and direct appeal attorney, House, had been ineffective by failing to raise Thums' own, *pro se* assertion regarding Judge Lister's supposed *ex parte* communication with the jury before their

16

afternoon deliberations.  That claim, the court explained, had to be brought in a petition for a writ of habeas corpus in the appellate court. [9]  *Id*.

Finally, Thums petitioned the Wisconsin Supreme Court for review of the denial of his first, collateral postconviction motion, but he failed to file his petition within the 30-day time period prescribed by Wisconsin law.  Accordingly, the court dismissed his petition as untimely.  (Dkt. #18-13.)

### F. Second Collateral Post-Conviction Motion

Thums filed a second postconviction motion under Wis. Stat. § 974.06, alleging newly-discovered evidence.  Specifically, Thums offered an affidavit from a fellow inmate, Joseph Hrbacek, asserting that a couple months before the recorded conversation between Thums and Trepanier, he saw another inmate attacking Thums and demanding money.  The circuit court denied this second collateral motion without a hearing, noting that:  (1) Hrbacek's affidavit did not even identify Trepanier as Thums' alleged assailant, but only a man with "long hair"; and (2) there was no basis to find this evidence material or likely to

---

[9]In Wisconsin, the proper forum for challenging the effectiveness of appellate or postconviction counsel depends upon the deficiency alleged, even if the same lawyer represents the defendant on postconviction proceedings and then direct appeal as House did here.  Thus, in *State ex rel. Rothering v. McCaughtry*, 205 Wis.2d 675, 678-79, 556 N.W.2d 136 (Ct. App.1996), the Wisconsin Court of Appeals held that challenges to briefing and oral argument in the court of appeals must be raised in that court, whereas challenges to postconviction representation, which involves "proceedings in the trial court where such are a prerequisite to filing a notice of appeal," had to be raised in the trial court.   The court also noted that only two types of issues could be raised on appeal without first bringing a postconviction motion under Wis. Stat. § 809.30(2)(h):  (1) sufficiency of the evidence; or (2) "issues previously raised" in the trial court.  *Id*. at n.3. (citations omitted).

change the outcome at trial. (Dkt. #1-7.) After the Wisconsin Court of Appeals summarily affirmed, Thums did not petition the Wisconsin Supreme Court for review.

## G. Petition for State Habeas Corpus

On or June 9, 2016, Thums filed a petition for habeas corpus in the Wisconsin Supreme Court, alleging ineffective assistance of counsel by attorney House. (Dkt. #21-1.) The Wisconsin Supreme Court denied that petition without calling for a response from the State on September 8, 2016.

OPINION

As amended, petitioner's habeas petition raises eight claims: (1) the jury was biased; (2) the trial court held improper *ex parte* conferences with the jury; (3) prosecutorial misconduct; (4) newly-discovered evidence; (5) ineffective assistance of post-conviction counsel; (6) ineffective assistance of appellate counsel; (7) ineffective assistance of trial counsel based on numerous alleged errors; and (8) the trial judge was biased. The State contends that petitioner properly exhausted only three of these eight claims, each of which involve assertions of ineffective assistance that he pursued all the way to the Wisconsin Supreme Court on direct appeal. The State argues habeas review is barred for all the remaining claims because (1) petitioner procedurally defaulted them and (2) none of the exceptions to the procedural default doctrine apply.

The court begins with a review of the procedural default doctrine before turning to the allegedly defaulted claims.

### I. Procedurally Defaulted Claims

A petitioner seeking habeas relief must show that he is in custody "in violation of the Constitution or the laws of the United States." 28 U.S.C. 2254(1). Federal habeas corpus review does *not* reach errors of state law alone, including the state court's application of adequate and independent procedural rules. *Johnson v. Bett*, 349 F.3d 1030, 1037 (7th Cir. 2003) (citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)).  For a state procedural rule to be adequate to support a state court judgment, the rule need only be applied in a "consistent and principled way." *Page v. Frank*, 343 F.3d 901, 912 (7th Cir. 2003) (quoting *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000)).  Thus, state court decisions bar federal habeas review if "they rest upon firmly established and regularly followed state practice." *Page*, 343 F.3d at 912 (internal citations and quotations omitted).  Finally, "[o]ut of respect for finality, comity, and the orderly administration of justice," a federal court can consider a petition for a writ of habeas corpus on its merits only if the petitioner (1) exhausted all remedies available in the state courts and (2) fairly presented any federal claims in state court first. *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir. 1996) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)).

"Fair presentment" requires that a petitioner give state courts a fair opportunity to address his claims and correct any error of a constitutional magnitude. *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001) (citing 28 U.S.C. § 2254(b),(c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999)).  To satisfy that requirement, the petitioner must present to the state courts both the operative facts and the legal principles that control each claim, calling the court's attention to the federal constitutional nature of his claims. *Badelle v.*

*Correll*, 452 F.3d 648, 661 (7th Cir. 2006).  A petitioner must also follow the state's procedural rules by presenting his claims in the time and manner required by state law. *Chambers v. McCaughtry*, 264 F.3d 732, 738–89 (7th Cir. 2001).

Based on these principles, a petitioner seeking habeas relief from an adverse state court decision must have presented their federal constitutional claims to both the Wisconsin Circuit Court and Court of Appeals, as well as by petition for discretionary review with the Wisconsin Supreme Court within 30 days of the court of appeals' decision. Wis. Stat. § 808.10. Because the supreme court loses jurisdiction to consider the petition once that thirty-day deadline passes, *Buelow v. Dickey*, 847 F.2d 420, 424–25 (7th Cir. 1988) (citing *First Wisconsin Nat'l Bank v. Nicholaou*, 87 Wis.2d 360, 274 N.W.2d 704, 705 (1979)), an untimely petition effectively denies the Wisconsin Supreme Court a fair opportunity to address his claims and amounts to a procedural default.  *See id*.

Once a court determines that the petitioner procedurally defaulted on his claim, the merits of that claim can only be addressed if the petitioner can demonstrate:  "(1) a cause for and actual prejudice arising from failing to raise the claim as required or (2) that enforcing the default would lead to a 'fundamental miscarriage of justice.'"  *Gomez*, 350 F.3d at 679 (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).  Though the Supreme Court has not identified with precision exactly what constitutes "cause" to excuse a procedural default, a petitioner must generally show that something external to him (that is, something out of his control) caused the procedural default.  *See Morrison v. Duckworth*, 898 F.2d 1298, 1301 (7th Cir. 1990) (finding that a petitioner can establish cause by showing some objective factor external to the defense impeded efforts to comply with the

State's procedural rules, including "factual or legal defenses not originally available or interference by officials that makes compliance with state procedures impracticable").  As for proof of a "miscarriage of justice," a petitioner "must demonstrate that he is actually innocent of the crime for which he was convicted -- that is, he must convince the court that no reasonable juror would have found him guilty but for the errors allegedly committed by the state court."  *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004) (citing *Schlup v. Delo*, 513 U.S. 298, 327–29 (1995)).

With this legal framework, and especially evidentiary burdens the petitioner must meet, the court will turn to each of his claims that the State argues he procedurally defaulted.

### A.  Jury Bias

First, petitioner claims he was denied "a fair trial" because of a "biased jury from voir dire through entire trial." (Pet. (dkt. #1) 6.) The State contends that petitioner procedurally defaulted this claim by failing to present it to the Wisconsin courts in his original postconviction motion and direct appeal, as well as in any of his *pro se*, post-conviction motions.  Consistent with the discussion above, to determine whether a petitioner has fairly presented a federal constitutional claim to state courts, four factors must be considered:  (1) whether the petitioner relied on federal cases that engage in a constitutional analysis; (2) whether the petitioner relied on state cases that apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms that call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of federal constitutional litigation.

*Wilson*, 243 F.3d at 327.   "The bottom line is that the 'task of the habeas court in adjudicating any issue of fair presentment is assessing, in concrete, practical terms, whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis.'"   *Kurzawa v. Jordan*, 146 F.3d 435, 442 (7th Cir. 1998) (quoting *Verdin v. O'Leary*, 972 F.2d 1467, 1476 (7th Cir. 1992)).

To begin, petitioner concedes, as he must, that he did not "enumerate specifically" a jury bias claim in any of his state court postconviction motions.   (Pet.'s Br. in Supp. (dkt. #21) 3.)   Still, he argues that the state courts should have *inferred* such a claim from his Wis. Stat. § 974.06 motion, because he objected to:   (1) the presence of several uniformed guards in the courtroom during his trial; (2) the trial court's alleged unauthorized, initial *ex parte* meeting with the jury; and (3) the prosecutor's alleged inflammatory comments to the jury.   At most, these objections *may* have broadly outlined a due process claim, but they do not call to mind a biased jury claim.   For example, petitioner did not identify any individual jurors who appeared to be biased, nor did he ask for a contemporaneous hearing to prove bias.   Moreover, petitioner did not cite to the Sixth Amendment to the United States Constitution, which guarantees the right to an impartial jury, nor cite to any case law that might have alerted the state courts that he was asserting a denial of his Sixth Amendment right to an impartial jury.   To the contrary, petitioner's focus throughout the state court proceedings had been on alleged misconduct by the trial judge, the prosecutor, and his own trial counsel, each of whom he claims *influenced* the jurors into delivering guilty verdicts, *not* on any misconduct or bias on the part of the jurors themselves.   Accordingly,

insofar as petitioner purports to assert a freestanding claim based on a denial of his right to an impartial jury, that claim is procedurally defaulted.[10]

### B. Alleged Improper Judicial Communication During Jury's Deliberations

Second, petitioner alleges that his right to be present at a critical stage of the trial was violated when Judge Lister allegedly met twice with the jury during its deliberations without the presence of counsel or Thums. *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (although the right to be present is rooted in the Sixth Amendment's Confrontation Clause, the Due Process Clause protects defendant's right to be present at trial when not actually confronting witnesses or evidence against him). Respondent argues that petitioner procedurally defaulted this claim by failing to appeal from Judge Lister's order after remand, including his denial of petitioner's motion for recusal based on these same, alleged improper communications.[11]

In response, petitioner argues that the Wisconsin Court of Appeals erred in suggesting that he could have raised the alleged, *ex parte* communications as an issue on direct appeal from the trial court's order after remand. In particular, petitioner points out

---

[10] Also, as the State points out, petitioner represented himself with respect to his two Wis. Stat. § 974.06 collateral motions, so he cannot establish cause for his default. *See, e.g.*, *Smith v. McKee*, 598 F.3d 374, 385 (7th Cir. 2010) ("This court has specifically rejected the argument that a petitioner's *pro se* status alone constitutes cause in a cause-and-prejudice analysis.").

[11] The State also argues that petitioner defaulted this claim again when his appellate lawyer failed to pursue it on direct appeal, and then defaulted any claim of ineffective assistance by his appellate counsel in doing so by *not* filing a habeas corpus petition in the Wisconsin Court of Appeals. However, it is unnecessary to address these secondary arguments in light of this court's finding above that petitioner defaulted by failing to appeal from the trial court's order denying recusal on remand.

that the trial court considered the *only* issue properly before it on remand was whether petitioner had the financial means to pay the imposed fine.  However, petitioner cites no authority excusing nor provides any explanation for not appealing Judge Lister's denial of his motion for disqualification.  Indeed, petitioner raised the issue in a formal motion, and the trial court specifically denied that motion on the record at the outset of the remand hearing.  Moreover, the Wisconsin Court of Appeals found that denial was an appealable order, and petitioner presents no legal authority suggesting otherwise.  Accordingly, petitioner has procedurally defaulted this claim.  Finally, having represented himself during the remand proceedings, petitioner cannot establish cause for his own default.

For the sake of completeness, even if he hadn't procedurally defaulted this claim, the court also notes that petitioner still would not be entitled to habeas relief.  As an initial matter, although it is undisputed that the trial court had *one ex parte* conversation with the jury at the close of their deliberations in the afternoon to address security concerns -- something counsel on both sides agreed would be best handled by the judge talking to the jury along -- there is *no* proof that there was ever a second, unauthorized conversation earlier that day.  At best, petitioner would infer a second conversation from the jury's note indicating that it had been told something that "morning" about Thums not having any personal information about them; and from the fact that Judge Lister said he would tell the jury "again" that materials in the case were sealed, and that he intended to refer to them only by juror number if polling was sought after the verdict is announced.  Although these remarks certainly suggest a prior communication, there is no evidence establishing that this prior discussion occurred between the jury and the judge, since some other court

official may have previously attempted to allay the jury's security concerns.[12]  It is not even clear whether any such communication was *ex parte*, since the court may have addressed the jury in counsel's presence but off the record.  Regardless, Judge Lister was adamant that he spoke to the jury *ex parte* only *once*, and even then with counsels' permission *and* after the jury indicated it had already reached its verdict.  Of even further note, Judge Lister *gave* Thums' postconviction counsel permission to contact jurors to confirm his version of the events.  Yet it appears Thums' lawyer never made contact *or* the jurors denied any earlier conversation.  Thums has nothing but speculation to support his claim that the trial court had not one, but two *ex parte* communications with the jury.

Finally, even assuming for the sake of argument that two conversations occurred, petitioner *still* would not be entitled to relief.  Although *ex parte* communications held off the record are of serious concern, they do not necessarily rise to the level of constitutional error absent proof of prejudice to the defendant.  *Rushen v. Spain*, 464 U.S. 114, 119 (1983) (rejecting contention that *ex parte* communications conducted off the record could never be harmless error).  Thus, when the trial court makes only "brief procedural remarks" and "does not discuss any fact in controversy," courts have declined to find reversible error. *Rushen*, 464 U.S. at 121 (no reversible error where judge failed to disclose conversation with juror who visited him in chambers to tell him that she failed to recall certain information during *voir dire* about a crime unrelated to the one being tried); *Ellsworth v. Levenhagen*, 248 F.3d 634, 640 (7th Cir. 2001) (affirming denial of habeas relief where trial

---

[12]  For example, as alluded to in the fact section above, it is more probable a bailiff or another court officer had earlier addressed the jurors' concerns about Thums' access to their private information.

court's *ex parte* communications consisted of accurate answers to jury's questions about whether it could review certain reports and exhibits); *Verdin*, 972 F.2d at 1482 (finding no prejudice when judge answered jury's question regarding use of jury forms, instructing jury that if they found defendant guilty of murder not to also return the jury form for manslaughter).   Here, although the exact wording of the court's remarks is unknown, petitioner seems to concede that the purpose of the conversations was to explain how the court had and would protect the jurors' identifying information from being disclosed. Under these circumstances, given that the court was merely explaining procedural matters at the jury's request, there is no basis to find that the communication (authorized or not) had a prejudicial effect on petitioner, nor rendered his trial "fundamentally unfair."   For these reasons, petitioner's claim would fail on the merits even if he had not procedurally defaulted it.

### C.  Prosecutorial Misconduct

Third, Thums claims that a host of actions by the prosecutor violated his right to a fair trial, including "poisoning" the jury, vouching for witnesses, and knowingly introducing false evidence.  (Dkt. #21, at 53-55.)  Although Thums raised this claim in his first post-conviction motion under Wis. Stat. § 974.06, the Wisconsin Court of Appeals held that Thums was procedurally barred from doing so having failed to raise it in his Wis. Stat. § 974.02 postconviction motion or on direct appeal.  Similarly, the court rejected Thums' claim that his default was caused by the ineffectiveness of his post-conviction counsel.

Finally, although Thums petitioned for review of these ruling, the Wisconsin Supreme Court rejected his petition on the ground that it was untimely.

Petitioner also procedurally defaulted any prosecutorial misconduct claim by failing to file a petition for review in the Wisconsin Supreme Court within 30 days of the court of appeals' decision rejecting his Wis. Stat. § 974.06 motion. Petitioner asserts that his petition was untimely only because staff at the prison failed to follow proper procedures in response to petitioner's request for copies of documents, costing Thum some "9 days against [his] deadline of 30 days to file the Petition for Review." (Dkt. #21, at 7-9.) While "interference by officials that makes compliance with state procedures impracticable" *can* establish cause for a procedural default, *Morrison*, 898 F.2d at 1301, petitioner has not made that showing here. On the contrary, even crediting petitioner's assertion that he lost 9 days due to clerical delay beyond his control, he still had 21 days left to file his petition for review within the applicable 30-day deadline. Moreover, petitioner makes no showing that the copies he was awaiting were even necessary for filing of his petition for review. Accordingly, the court cannot find that circumstances beyond petitioner's control led to his untimely filing, much less that government officials were to blame for his delay.

### D. Newly Discovered Evidence

Fourth, petitioner challenges the trial court's denial of his motion for a new trial based on newly discovered evidence. "For claims based on newly discovered evidence to state a ground for federal habeas relief, they must relate to a constitutional violation independent of any claim of innocence." *Johnson v. Bett*, 349 F.3d 1030, 1038 (7th Cir.

2003) (citing *Herrera v. Collins*, 506 U.S. 390 (1993)).  For this reason, the mere "refusal to grant a new trial on the basis of newly discovered evidence is not actionable in habeas corpus." *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir.1993).  Here, petitioner has not identified any constitutional violation arising out of his claim of newly-discovered evidence.

Moreover, even assuming his claim were actionable, however, this court could still not review it, since petitioner further failed to petition the Wisconsin Supreme Court for review of the court of appeals' denial of relief.  While Thums now maintains that a petition would have been "futile," particularly given the state courts' refusal to offer any relief up to that point, a petitioner "cannot simply opt out of the state review process because he is tired of it or frustrated by the results he is getting." *Cawley v. DeTella*, 71 F.3d 691, 695 (7th Cir. 1995).  Instead, by opting out, Thums also procedurally defaulted this claim.

### E. Ineffective Assistance of Original Post-Conviction and Direct Appeal Counsel

Fifth, petitioner contends that his post-conviction lawyer was ineffective for not raising numerous claims, including those just determined to have been defaulted above. Even acknowledging the *Alice in Wonderland* quality of the procedural default rule in this case, however, the State is right to point out that petitioner failed to raise his claim of ineffective assistance of post-conviction counsel until his first Wis. Stat. § 974.06 motion, then again failed to preserve that claim by not timely petitioning for review in the Wisconsin Supreme Court.  Having failed to present his claim of ineffective assistance of counsel at all levels of state court review, therefore, petitioner has also procedurally defaulted this claim.

### F. Ineffective Assistance of Appellate Counsel

Sixth, petitioner contends that his appellate lawyer was ineffective for failing to pursue the following issues on appeal:  (1) Thums' *pro se* argument that the circuit court erred by meeting *ex parte* with the jury at the end of their afternoon deliberations; (2) prosecutorial misconduct; and (3) numerous claims of ineffective assistance of counsel. (Sup. Ct. Pet. for Writ of Habeas Corpus (Dkt. #21), Ex. A, 2-3.)  The State contends that petitioner procedurally defaulted his claim of ineffective assistance of appellate counsel because he filed for a writ of habeas corpus in the Wisconsin Supreme Court, instead of going to the Wisconsin Court of Appeals first as required. *State v. Knight*, 168 Wis. 3d 509, 522, 484 N.W. 2d 540 (1992).

As an initial matter, filing a state habeas petition in the wrong forum may or may not amount to a procedural default.  Certainly, the State cites no rule or case law holding that such a mis-filing would prevent petitioner from re-filing his petition in the proper appellate court.  Moreover, although the State may assert the equitable defense of laches if a petitioner delays unreasonably, there is no deadline in Wisconsin for bringing habeas corpus petitions.  *State ex rel. Lopez-Quintero v. Dittmann*, 2019 WI 58, ¶ 29, 387 Wis. 2d 50, 79, 928 N.W.2d 480, 494.  Given that a state procedure appears to remain available for petitioner to raise his claim of ineffective assistance of appellate counsel, he has *not* defaulted it, although he *has* failed to exhaust it.  *See* 28 U.S.C. § 2254(c) (Federal habeas petitioner shall not be deemed to have exhausted claim "if he has the right under the law of the State to raise, by any available procedure, the question presented.").

Of course, even when the applicant has not exhausted his state court remedies, a federal court *may* deny a federal habeas petition on the merits. 28 U.S.C. § 2254(b)(2). To prevail on his claim of ineffective assistance of appellate counsel, petitioner must establish that at least one of the three issues appellate counsel failed to raise on direct appeal were "both obvious and clearly stronger" than the issues he did raise. *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Unfortunately for petitioner, he cannot make that showing. As explained above, his claims concerning the *ex parte* communications are meritless, and certainly not "clearly stronger" than the issues appellate counsel did raise -- alleged multiplicity, erroneous jury instructions, the sufficiency of the evidence, and various claims of ineffective assistance of counsel. As for his claims of prosecutorial misconduct and ineffective assistance of trial counsel, both had to be raised in a postconviction motion in the trial court before they could be raised on direct appeal. *See State ex rel. Rothering v. McCaughtry*, 205 Wis.2d 675, 678 n.3, 556 N.W.2d 136 (Ct. App.1996) (without postconviction motion, only issues that can be raised directly on appeal are sufficiency of evidence and issues previously raised or preserved before or during trial). Thus, petitioner's is a claim of ineffective assistance of *postconviction*, not appellate, counsel. As noted in the previous section, however, petitioner asserted a claim of ineffective assistance of postconviction counsel in his first Wis. Stat. § 974.06 motion and then procedurally defaulted that claim by failing to file a timely petition for review in the Wisconsin Supreme Court.[13]

---

[13] While not entirely clear from petitioner's voluminous submissions, petitioner appears to fault his appellate lawyer for omitting certain claims of ineffective assistance of trial counsel from the petition for review filed in the Wisconsin Supreme Court. Because Thums had no constitutional

### G. Biased Judge

Finally, petitioner claims that the trial judge was biased, but this is no different from his previously rejected claim that the trial court had improper *ex parte* communications with the jury as addressed above.  Accordingly, the court need not address it further.

## II. The Miscarriage-of-Justice Exception Does Not Save These Defaulted Claims

The final step in a procedural default analysis requires this court to consider petitioner's argument that this court should review some or all of his defaulted claims under the "miscarriage-of-justice" exception.  A fundamental miscarriage of justice occurs only where the petitioner presents evidence showing that he is "actually innocent" of the charges against him or the punishment imposed. *Dretke v. Haley*, 541 U.S. 386, 393 (2004).  Under this exception, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would [find] petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 319–322 (1995)).  This standard "is a demanding one that 'permits review only in the extraordinary case.'" *Coleman v. Lemke*, 739 F.3d 342, 349 (7th Cir. 2014) (quoting *House*, 547 U.S. at 538).  "To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have

---

right to counsel in filing a petition for discretionary review with the Wisconsin Supreme Court, however, counsel's alleged ineffectiveness is neither a basis for a finding of cause nor an independent ground for federal habeas relief.  *See Ross v. Moffitt*, 417 U.S. 600, 610 (1974) (no constitutional right to counsel on discretionary appeal to state supreme court); *Knight v. Pollard*, 09-cv-18-bbc, 2009 WL 1970452, *3 (W.D. Wis. July 6, 2009) (because petitioner had no constitutional right to counsel in discretionary review proceeding, he had no federal right to insist that a lawyer's performance on discretionary review met constitutional standards for effective counsel).

documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (citing *Schlup*, 513 U.S. at 324).

Petitioner plainly lacks such evidence. Although Thums points to various, omitted evidence bolstering his claim that he was scared of Trepanier or tended to undermine Trepanier's credibility, none of this additional proof convincingly demonstrates his actual innocence. Indeed, the fundamental factual question before the jury was whether to believe either: (1) Thums' incredible testimony that he was merely "stringing Trepanier along" about murdering his ex-wife because he was frightened Trepanier would beat him; or (2) Trepanier's testimony that Thums had asked him to kill his ex-wife and provided him with the means (in the form of maps) and incentive (in the form of identified valuables) to do so, all of which was bolstered by the recording of Thums himself. Nothing that Thums points out in this record comes close to showing that a reasonable jury could *not* believe the latter version of events. Accordingly, the miscarriage of justice exception does not afford a gateway to federal review of *any* of petitioner's defaulted claims.

## III.  Properly Exhausted Claims

Thus, this court arrives at the three claims of ineffective assistance of trial counsel that were properly exhausted. Petitioner claims that trial counsel was deficient in the following respects: (1) not consulting with Thums with regards to juror questions; (2) not ensuring a neutral response to the jury's question regarding the "overt act" element of the

conspiracy offense; and (3) not objecting to the circuit court's re-instruction to the jury with regards to the "overt act" element of the conspiracy charge.  Petitioner raised these same claims in his original post-conviction motion, on direct appeal, and in a petition for review with the Wisconsin Supreme Court, each time by arguing that counsel was ineffective under the two-part test set out in *Strickland v. Washington*, 466 U.S. 668 (1984).

When a state prisoner challenges a state court conviction on grounds that were adjudicated on the merits in state court, the petitioner must establish that his conviction was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  "A decision is 'contrary to' clearly established federal law if the rule the decision applies differs from governing law set forth in Supreme Court cases.  A decision involves an 'unreasonable application' of Supreme Court precedent if the decision, while identifying the correct governing rule of law, applies it unreasonably to the facts of the case."  *Bailey v. Lemke*, 735 F.3d 945, 949–50 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002), and *Williams v. Taylor*, 529 U.S. 362, 407 (2000)).  The court applies these standards to the decision of the last state court to adjudicate a given claim on the merits.  *Williams v. Bartow*, 481 F.3d 492, 497–98 (7th Cir. 2007).  In this case, as previously discussed, the relevant decision was issued by the Wisconsin Court of Appeals.

Under § 2254(d)(2), a federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. But, again, the federal court owes deference to the state court:  the underlying state court findings of fact

and credibility determinations against the petitioner are presumed correct unless the petitioner comes forth with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Smith,* 770 F.3d 540, 546 (7th Cir. 2014); *Newman v. Harrington,* 726 F.3d 921, 928 (7th Cir. 2013).

The standard outlined in § 2254(d)(1) is exacting and "highly deferential," *Burt v. Titlow,* 571 U.S. 12, 18 (2013). To prevail, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter,* 562 U.S. at 103. Put another way, so long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable, the court must deny the petition. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

To prevail on his exhausted claims of ineffective assistance of counsel, petitioner faces a particularly heavy burden: when *Strickland*'s deferential standard for measuring attorney performance is viewed through the lens of AEDPA's own deferential standard, the result is a doubly deferential form of review that asks only "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter,* 562 U.S. at 89. This means that "only a clear error in applying *Strickland* will support a writ of habeas corpus." *Allen v. Chandler,* 555 F.3d 596, 600 (7th Cir. 2009). So long as the Wisconsin Court of Appeals "took the constitutional standard seriously and produced an answer within the range of defensible positions," this court must deny relief. *Taylor v. Bradley,* 448

F.3d 942, 948 (7th Cir. 2006) (quoting *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000)).

Examined against this exacting standard, petitioner is not entitled to habeas relief on any of his ineffective assistance of trial counsel claims.  As an initial matter, the Wisconsin Court of Appeals properly recognized that *Strickland* had established the standard for evaluating claims of ineffective assistance of counsel.  *State v. Thums*, 2013 WI App 105, ¶ 33.  Under *Strickland*, a defendant must show:  (1) his lawyer's acts or omissions were not reasonable under the prevailing professional norms; *and* (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  466 U.S. at 688, 694.  The court need not address both components of the inquiry if the defendant makes an insufficient showing on one.  *Id*. at 697.

Applying this standard, the Wisconsin Court of Appeals rejected petitioner's claims that his trial counsel was ineffective.  Assuming without deciding that trial counsel had provided deficient performance in the manner alleged by petitioner, the court found that petitioner had not satisfied *Strickland*'s prejudice prong because:  "Thums has failed to demonstrate that the trial was rendered unreliable or the proceeding fundamentally unfair as a result."  *Thums*, at ¶ 36.  The court further found that Thums had *not* been prejudiced by his lawyer's having suggested the additional instruction given to the jury in response to their question about the "overt act" element.  *Id*. at ¶ 38.  In particular, the court of appeals noted that the jury had heard the recording of Thums asking Trepanier to kill his ex-wife and daughters and burglarize the residence of his former mother-in-law, which belied Thums' claim that he was responding to a perceived threat from Trepanier.  Further, it

noted that Thums had admitted drawing the maps showing the location of his ex-wife's and mother-in-law's homes and gave them to Trepanier. *Id*. For these reasons, the state appellate court agreed with the trial court that the result of the proceeding would not have been different but for counsel's alleged errors.

Petitioner argues that the state appellate court's determination rested on an unreasonable determination of the facts because the second map did not depict the location of his ex-wife's home, and he would have pointed this out to counsel had he been present during the discussion about the jury's question. However, he appears to concede that the map showed the location of his ex-mother-in-law's home, and Trepanier testified that petitioner told him that his ex-mother-in-law had valuable duck decoys that Trepanier could steal as part of the payment for killing petitioner's ex-wife. Moreover, Trepanier testified that, contrary to what Thums asserts in his petition, the second map *did* depict Thums' ex-wife's home. (Tr. of 1st Day of Jury Trial (Dkt. #18-18) 112:4-11.) Thus, there was a reasonable basis in the record for the jury and the Wisconsin Court of Appeals to find that the second map depicted the location of Thums' ex-wife's home.

In light of these facts, this court agrees with the Wisconsin Court of Appeals that the outcome at Thums' trial on the conspiracy charge was not reasonably likely to have been different had his lawyer consulted with him or proposed a more "neutral" response to the jury's question about the "overt act" element. Moreover, the jury instructions made clear that they needed to find an overt act beyond mere planning and agreement in order to convict Thums on the conspiracy charge, something the jury obviously understood as evidenced by their question to the judge. Finally, Thums never denied drawing the second

map, and the additional instruction made plain that it was up to the jury to decide whether the overt act element was met.

Notably, the Wisconsin Court of Appeals found that the additional jury instruction accurately explained that "the drafting and the delivery of the [second] map, if other requirements were met, is a sufficient overt act[.]" *Thums*, 2013 WI App 105, ¶20.  Because a state court's jury instructions turn on state law, this court generally cannot review a claim of erroneous jury instructions unless it implicates the petitioner's due process right to a fair trial.  *Perruquet*, 390 F.3d at 511.  That threshold is plainly not met here.  Importantly, the defense Thums presented to the jury did *not* dispute that he had drawn the maps, nor that his doing so could constitute an overt act, but rather that he had an "innocent explanation" for doing so, in that he never intended to harm his wife or anyone.  In the end, the jury simply did not believe him.  Although *perhaps* Thums' attorney could have proposed a clarifying instruction that was more balanced or neutral, and maybe the trial judge would have given it, the outcome of the trial was not reasonably likely to have been different had he done so.  Accordingly, because fair minded jurists could certainly agree with the Wisconsin Court of Appeals' conclusion that Thums had not been prejudiced by his counsel's performance, petitioner is not entitled to habeas relief on his exhausted claims of ineffective assistance of counsel.

## IV.  Certificate of Appealability

The final issue the court must consider is whether to issue a certificate of appealability of this final order adverse to the petitioner.  See 28 U.S.C. § 2253(c)(2); Rule

11 of the Rules Governing Section 2254 Cases.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Tennard v. Dretke,* 542 U.S. 274, 282 (2004).  In addition, when a § 2254 motion is denied on procedural grounds, a certificate of appealability should issue only when the petitioner shows that reasonable jurists "would find it debatable whether the district court was correct in its procedural ruling."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  To make a substantial showing, petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack,* 529 U.S. at 484.

Given that petitioner plainly failed to timely pursue his state appellate remedies with respect to most of his claims, and he has failed to establish any colorable grounds to excuse his failures for cause or under the miscarriage of justice exception, no reasonable jurists would find it debatable whether this court was correct in its procedural rulings.  As for those claims that this court considered on the merits, petitioner likewise cannot meet the standard for a certificate of appealability, in light of the reasonableness of the Wisconsin Court of Appeals' opinion and the overall weakness of petitioner's claims.  Accordingly, a certificate of appealability will not issue.

ORDER

IT IS ORDERED that:

1.  The clerk of court is directed to substitute Larry Fuchs, warden of Columbia Correctional Institution, as the respondent in this case.

2.  Ronnie Thums' application for habeas relief, as amended, is DENIED and this case is DISMISSED with prejudice.

3.  A certificate of appealability under 28 U.S.C. § 2253(c)(2) is DENIED.

Entered this 20th day of October, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge